In the Matter of FISHER HOLDING COMPANY, INC., Debtor.

Bankruptcy No. EV 79–6–RA.

United States Bankruptcy Court, S. D. Indiana.

April 20, 1981.

Halbert W. Kunz, Kunz & Kunz, Indianapolis, Ind., Frank Hahn, Yocum & Hahn, Evansville, Ind., for Paul Teegarden, Paul Teegarden, Inc., and Kitchen Machinery, Inc.

Richard A. Wetherill, Mason & Wetherill, Rockport, Ind., Gary E. Becker, Zoercher, Becker & Huber, Tell City, Ind., for Jerry Embry, Jerry Embry, Inc., and James Marksberry.

Joseph H. Harrison, Bowers, Harrison & Kent, Evansville, Ind., for debtor.

MICHAEL H. KEARNS, Bankruptcy Judge.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

This matter came before the Court upon the Application for Appointment of Receiver of applicants, Paul A. Teegarden, James A. Marksberry, Jerry F. Embry and Jerry F. Embry, Inc. Hearing on said Application and supplemental motions was held, evidence and arguments thereon were heard on December 5, 1980.

The Court, having heard the evidence and arguments thereon, having observed the demeanor of the witnesses and weighed their credibility, and being duly advised in the premises, now enters the following Findings of Fact, Conclusions of Law and Order.

## FINDINGS OF FACT

1) This Court has jurisdiction over the subject matter and the parties by reason of the Bankruptcy Act as amended.

2) The debtor, Fisher Holding Company, Inc., filed a Voluntary Petition for an Arrangement under Chapter XI of the Bankruptcy Act in the United States District Court for the Southern District of Indiana on August 21, 1979, and said cause was referred to the Judge in Bankruptcy in and for said District, Evansville Division, on that date.

3) Pursuant to an order of the Bankruptcy Judge entered on August 23, 1979, the debtor has remained in possession and operated its business, making monthly reports to the Court.

4) Fisher Holding Company (hereinafter the debtor or FHC) is a corporation organized under the laws of the Commonwealth of Kentucky. The debtor corporation is engaged in the coal brokerage business. Debtor's principal asset is a coal supply contract (hereinafter the contract) with Big Rivers Electric Company (hereinafter BREC) of Henderson, Kentucky. Said contract calls for a certain monthly quantity (currently 30,000 tons) and quality of coal to be delivered to BREC. The supply of coal under said contract constitutes the only business currently being conducted by the debtor in possession.

5) Applicants allege that the principals of the debtor corporation have a conflict of interest in that said principals, particularly Fred A. Smith, Jr., own controlling interests in Delta Mining Corporation, (Delta), and Grandview Dock Corporation, Inc., (GDC), both creditors of the debtor corporation.

6) In its current operations, debtor buys all of the coal supplied to BREC under the contract from Delta and pays for the use of GDC's facilities in shipping the coal. Delta produces some coal and buys the rest from suppliers, some of whom previously supplied the debtor directly. Delta has undertaken to mix the coal to meet the average monthly quality specifications under the contract, and in fact absorbs quality penalties under the contract as a "philosophical thing." Fretina Corporation, of which Fred Smith is president and principal owner, supplies managerial staff to the debtor corporation without compensation.

Fretina's management team consists of Fred A. Smith, Jan P. Adams and Hugh Trobridge, who are president, vice president and secretary respectively of Delta, GDC and Fretina. FHC's officers are Smith, president; Jerry Douglas, Vice president; Adams, secretary; and Trobridge, treasurer.

7) Jerry F. Embry, former president of FHC, testified at the receivership hearing that FHC operated the Grandview Dock and owned equipment there prior to June 18, 1979. The equipment, on which FHC was making financing payments, included feeders, computerized scales, several different conveyors and a crusher, all of which equipment is still at the Grandview Dock. GDC has agreed to pay rental on said equipment from June 19, 1979, after an appraisal of the rental value is completed.

8) On average monthly gross receipts of Five Hundred Ninety-seven Thousand Five Hundred Sixty-one Dollars and Twenty-six Cents ($597,561.26) in the fifteen (15) months preceding the receivership hearing

in this cause, the debtor in possession reported an average monthly profit of Twenty Thousand Four Hundred Sixty-eight Dollars and Ninety-three Cents ($20,468.93). In the two (2) months since the hearing, debtor has reported monthly gross receipts of Seven Hundred Twenty-one Thousand Fifteen Dollars ($721,015.00) and Eight Hundred Seventy-eight Thousand Two Hundred Thirty-two Dollars ($878,232.00) and profits of Twenty-eight Thousand Three Hundred Twenty-two Dollars ($28,-322.00) and Eighteen Thousand Fifty-nine Dollars ($18,059.00) respectively. Applicants argue that the debtor's business would be more profitable, and consequently better serve the interests of the general creditors, if operated by a party without the conflicting interests of current management of the debtor. There is evidence before the Court that FHC did not make a profit under previous management.

9) In 1978, FHC entered into a Bareboat Charter and Purchase Option for the towboat "Wally Fulghum." The purchase option provided that the debtor could purchase the boat for One Hundred Eighty Thousand Dollars ($180,000.00) less two-thirds (⅔) of the charter hire ($4,500.00 per month) paid prior to the exercise of the option. The option required debtor to give written notice to the towboat owner, Serodino, Inc., during the first six (6) months of the charter in order to exercise said option. FHC paid rent for approximately fifteen (15) months under the charter agreement. No notice of intent to exercise the purchase option was ever given to Serodino.

10) In 1979, FHC fell into default under the bareboat charter and Serodino, Inc. undertook arrangements to regain possession of the vessel. On June 7, 1979, Mr. Leonard D. Slutz, attorney for Serodino, wrote Mr. Jerry F. Embry, then president of FHC, regarding redelivery of the boat. Subsequently, Mr. Joseph Harrison, attorney, contacted Mr. Slutz on behalf of Fred A. Smith, Jr., regarding the exercise of the option under the charter agreement. Mr. Harrison informed Mr. Slutz that Fred Smith "had some way in which he could take over operation of the dock" and wanted to buy the vessel. Slutz told Mr. Harrison that Serodino's position was that the charter had been breached and rent was in default. Mr. Slutz indicated he did not know if the owner was interested in selling the Wally Fulghum, but a "fair price" might be arranged, and that he believed the vessel was worth in excess of One Hundred Eighty Thousand Dollars ($180,000.00) less the two-thirds (⅔) of the rent paid, as called for under the purchase option of the charter agreement. In June of 1979, Serodino sold the boat to Fred Smith and Joseph Harrison. Leonard Slutz described the sale price,

"I have in my notes some calculations and in one place, it comes to $144,000 plus $50.00 per day from June the 21st. Another place it comes out to $144,750 and I think I was trying to figure approximately what the option price would be if you gave credit for the payments that had been made. Although I knew I wasn't bound by that price, I could quote whatever price I thought was all right. I see that eventually, we agreed to $145,100.

Slutz stated in his deposition that, during this transaction, he was under the impression that Joseph Harrison was the lawyer for FHC.

11) The Wally Fulghum was subsequently, and is currently, titled in the names of Fred Smith, Jr. and Joseph H. Harrison.

12) William F. Carrier, a Marine Surveyor, testified by deposition that he valued the Wally Fulghum at a fair market value of between Two Hundred Sixty Thousand Dollars ($260,000) and Two Hundred Seventy-five Thousand Dollars ($275,000) in April of 1978. John Davis, manager of Owensboro Harbor Service and a river pilot, testified that in the summer of 1979, the vessel was worth between Two Hundred Forty Thousand Dollars ($240,000) and Two Hundred Fifty Thousand Dollars ($250,000). Mr. David also indicated that few such boats were for sale in the United States at that time.

## CONCLUSIONS OF LAW

The Court has jurisdiction over the parties and the subject matter by reason of the Bankruptcy Act as amended.

■ The Bankruptcy Court is a court of equity. *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). (See also 28 U.S.C. § 1481). A court of equity must do justice to all interested parties.

"In proceedings where allegations have been made by the debtor and a creditor that the other had engaged in improper, fraudulent and/or illegal conduct, and where unsecured creditors are unrepresented, the Bankruptcy Court must act as a court of equity to protect the rights of all parties. The Bankruptcy Court's equitable powers are necessarily quite broad and flexible, so that the Court may fashion the appropriate relief." *In re Parr*, 1 B.R. 453, 5 BCD 1143, 1145 (Bkrtcy.E.D. N.Y.1979).

The Court may, upon the application of any party in interest, appoint, if necessary, a receiver of the property of the debtor. § 332 of the Bankruptcy Act, 11 U.S.C. § 732. Bankruptcy Rule 11–18(b) provides that, upon the filing of a Chapter XI petition, the debtor shall continue in possession. However, the rule continues, the Court may, upon application of any party in interest and "for cause shown," appoint a receiver to take charge of the property and operate the business of the debtor.

The purpose of a Chapter XI arrangement is to preserve a viable business enterprise where possible and where such preservation is in the best interests of creditors. *Queens Boulevard Wine and Liquor Corp. v. Blum*, 503 F.2d 202 (2d Cir. 1974). The Court must resort to its broad equity powers in determining whether the appointment of a receiver is in the best interest of creditors.

"In equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests..... Moreover, equitable remedies are a special blend of what is necessary, what is fair and what is workable." *Lemon v. Kurtzman*, 411 U.S. 192, 200–201, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973).

See also *In re Hotel Associates, Inc.*, 3 B.R. 343, 6 BCD 160 (Bkrtcy.E.D.Pa.1980) and *In re Metro Stores Company, Inc.*, 4 BCD 886 (S.D.N.Y.1978).

■ The evidence before the Court raises serious questions as to the operation of the debtor corporation. Fred Smith, Jr., is the president of FHC, Delta Mining Corporation and Grandview Dock Corporation, Inc. Both Delta and GDC are creditors of the debtor. Furthermore, both of these entities are the principal business partners with FHC in its current operations, being the sole supplier of its coal and the operator of the dock the debtor uses. Evidence is before the Court that shows that GDC and Delta are using equipment which is the property of FHC, and no rent has yet been paid for the use of that equipment.

The evidence shows that Fred Smith, Jr., and his attorney, Joseph H. Harrison, exercised an option to purchase the towboat Wally Fulghum. That option existed under the terms of a bareboat charter agreement between the debtor and Serodino, Inc. The price which Mssrs. Smith and Harrison paid for the vessel clearly suggests that they were given credit for payments made by FHC under the charter agreements. The deposition of Leonard D. Slutz, supra, supports this conclusion. There was no evidence offered showing that Smith and Harrison compensated the debtor for the benefit of the bargain or debtor's equity in the Wally Fulghum.

Debtor shows the Court that it has made monthly profits since the commencement of this proceeding, whereas FHC did not make a profit under the management of petitioner, Jerry F. Embry. However, the role of this Court is to determine what is in the best interest of creditors, not whether debtor's current management is doing a better job than previous management. The question is: Would the appointment of a receiver be in the best interest of the estate? If a receiver could make a substantially greater sum available to be distributed to the creditors, then his appointment would obviously be in the best interest of the estate. But just as importantly, if the circumstances

suggest that the debtor in possession is operating the business in a manner which does not serve the best interest of creditors or in a manner which favors particular creditors which have interlocking directorships with the debtor corporation, then the appointment of a receiver is an appropriate remedy.

Inter-company transactions prompted the Bankruptcy Court to appoint a receiver under 11 U.S.C. § 1104(a)(2) of the new Bankruptcy Code in *In re L.S. Good & Co., et al, (Re J.W. Knapp Company)*, 8 B.R. 312, 7 BCD 103 (Bkrtcy.N.D.W.Va.1980). This Court is cognizant of the fact that the debtor in the *Knapp* case was suffering substantial operating losses. Nevertheless, the language of Judge Kamlowsky's decision is instructive,

> "The magnitude of the number of inter-company transactions places current management of Knapp in a position of having grave potential conflicts of interest and the presumption arises that the current management of Knapp will be unable to make the impartial investigations and decisions demanded in evaluating and pursuing inter-company claims on behalf of Knapp." 8 B.R. at 315, 7 BCD at 105.

This case involves not only possible (as well as existing) inter-company claims, but also the possibility of claims against principals and insiders individually. No action has been brought to determine the merits of the actions of the principals and their other corporations, and the Court does not pretend to pass judgment on those actions here. The Court does conclude, however, that the creditors have the right to a thorough and vigorous investigation of the allegations raised at the receivership hearing.

I am aware of the unequivocal statutory policy of maintaining the debtor in possession in a Chapter XI arrangement. *In re Metro Stores Company, Inc., supra.* The evidence before this Court establishes that the interests of creditors in this case would not be realized by permitting this debtor to remain in possession.

Accordingly, having considered the relevant equitable concepts and the best interest of creditors, the Application for Appointment of Receiver is hereby GRANTED.

### ORDER

It is therefore CONSIDERED, ADJUDGED AND DECREED that the Application for Appointment of Receiver of the above-named creditors is hereby GRANTED, that the Court's prior order of August 23, 1979, authorizing the operation of business by debtor in possession is hereby RESCINDED, and that the debtor, Fisher Holding Company, Inc., is hereby removed from possession.

The Court appoints BIRCH E. BAYH, JR., 2410 Indiana National Bank Tower, One Indiana Square, Indianapolis, Indiana 46204, as Receiver in this cause, effective immediately upon the execution of this Order, and the bond of said Receiver is hereby fixed in the amount of Six Hundred Thousand Dollars ($600,000.00).