**In re HUMPHREYS PEST CONTROL FRANCHISES, INC., Debtor.***

**Bankruptcy No. 82–05540K.**

United States Bankruptcy Court, E.D. Pennsylvania.

June 22, 1984.

See also Bkrtcy., 35 B.R. 712.

Joseph S.U. Bodoff, Philadelphia, Pa., for debtor.

Bankruptcy No. 82–05539K.

Melvin Lashner, Philadelphia, Pa., for creditors' comm.

Louis W. Fryman, Philadelphia, Pa., Trustee.

## OPINION

WILLIAM A. KING, Jr., Bankruptcy Judge.

Humphreys Pest Control Franchises, Inc. ("debtor") filed a Chapter 11 petition for reorganization on November 17, 1982. The debtor is a wholly-owned subsidiary of Humphreys Pest Control Company, Inc. ("parent corporation"). A Chapter 11 petition was also filed by the parent corporation on November 17, 1982.

The parent corporation operates an insect extermination business. The debtor was formed for the purpose of selling franchises in the insect extermination business to passive investors. Both corporations have remained in operation as debtors-in-possession under § 1108 of the Bankruptcy Code ("Code"). The officers and principals of the parent corporation are the same as the officers and principals of the debtor corporation.

A Creditors' Committee has been appointed in each case. The Creditors' Committee of the debtor, Humphreys Pest Control Franchises, Inc., has moved for the appointment of a trustee pursuant to § 1104(a)(2) of the Code for the following reasons:

(1) that alleged improper transfers of assets from debtor corporation to parent corporation have occurred;

(2) that these transfers constitute a commingling of debtor's assets with those of the parent corporation which is harmful to creditors of debtor corporation; and

(3) that the officers and principals of the debtor corporation have breached their fiduciary duties to the debtor because of conflicting interests.

On the basis of the evidence presented, we conclude that the appointment of a trustee is in the best interests of creditors.[1]

Section 1104(a)(2) provides:

(a) At anytime after the commencement of the case but before confirmation of a plan, on request of a party in interest and after notice and a hearing, the court shall order the appointment of a trustee—

> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders securities of the debtor or the amount of assets or liabilities of the debtor.

The debtor's assets consist of revenues received from the sale of franchises and royalty payments received from operation of the franchises. The debtor has no tangible assets.[2] On May 3, 1983, due to the debtor's failure to register the franchises as securities with the Pennsylvania Securities Commission, the Commonwealth Court of Pennsylvania prohibited the debtor from continuing to sell franchises without proper registration. Currently, the income received from monthly royalty payments is the only source of assets because the debtor is no longer selling franchises.

The evidence before us shows that over $650,000.00 was transferred from the debtor's assets to the parent corporation during the year preceding the bankruptcy filing.[3] Subsequent to the filing of the Chapter 11 petition, in excess of $125,000.00 has been transferred to the parent corporation.[4] The amounts transferred represent a significant portion of the debtor's monthly receipt of royalty payments. The net result of the cash transfers is that the debtor often has a negative cash flow at the end of each month.

---

1. This Opinion constitutes the findings of fact and conclusions of law required by Rule 7052 of the Rules of Bankruptcy Procedure.

2. N.T. p. 53.

3. N.T. pp. 15, 78; *See* also debtor's exhibit nos. 1–4.

4. N.T. pp. 93–99; *See* also Committee's exhibit no. 2.

■ The propriety of the transfers is challenged by the Creditors' Committee. The Committee asserts that the transfers violate the fiduciary duties owed to creditors by the debtor-in-possession[5] and leave the debtor with no assets for reorganization.

The debtor's response is that a management agreement exists between the debtor and its parent corporation. Testimony was offered at the hearing by Rosamond Humphreys, a principal and officer of the debtor, to show that the transfers were proper and supported by adequate consideration. When asked to explain the reasons for the transfers, Mrs. Humphreys testified as follows:

"They had a management agreement that was written up where Humphreys Pest Control would do certain things for the franchise corporation, such as handle their payroll, their—the housing of the operations, pay for that, all the computer and software that—of our systems, all of our training background and professional background that we have, and office expenses, auto expenses, travel—there were certain things that the franchise corporation—that the Humphreys Pest Control Corporation was doing for the Franchise Corporation, and they had this agreement, and in turn the Pest Control Company received 20 percent of the royalties received."[6]

Although Mrs. Humphreys testified as to the terms of the written management agreement, she was unable to support her testimony by producing either the original agreement or a copy of it at the hearing. Assuming, arguendo, that a management agreement does exist and that services were performed and expenses incurred on the debtor's behalf by the parent corporation, the debtor, nevertheless, was unable to provide an adequate accounting for the amounts transferred.

The Creditors' Committee offered into evidence "Cash Flow Statements" reflecting cash receipts and cash disbursements by the debtor on a month-to-month basis from November, 1982, the date the Chapter 11 petition was filed, until December, 1983.[7] The amounts listed as "Transfers" by the debtor to its parent corporation under the category of cash disbursements varied from month to month. No explanation was provided either on the statements themselves or at the hearing as to how the amounts transferred related to the alleged expenses incurred on behalf of the debtor or the payment of twenty (20%) percent of royalty receipts to the parent corporation under the terms of the management agreement. For example, in March of 1983, the amount transferred to the parent corporation represented forty-eight (48%) percent of the debtor's cash receipts for the month of March. In April of 1983, the amount transferred was eighty-one (81%) percent of cash receipts. In October of 1983, the amount transferred was one hundred and six (106%) percent of cash receipts.

The "Cash Flow Statements" also show that the debtor was paying many of its own expenses. For example, costs of advertising, insurance, utilities, rent, telephone, etc. are listed as cash disbursements. Yet, the parent corporation was allegedly incurring expenses on behalf of the debtor.

At the hearing, the debtor did provide additional documentation to substantiate the legitimacy of the transfers in the form of summaries from its books and records. However, these summaries of fees and royalties, cash flow, cash disbursements, and transfers were also lacking in explanatory detail and therefore, unconvincing.

■ We believe the Creditors' Committee had ample reason to question the propriety of the transfers when confronted

---

5. It is well established that a debtor-in-possession stands in the shoes of a trustee and owes a fiduciary obligation to all creditors. *See,* e.g., *In re Harms,* 10 B.R. 817, 819 (Bkrtcy.Colo.1981).

6. N.T. p. 79.

7. See Committee's exhibit no. 1. These statements were filed each month with the Clerk of the Court pursuant to the requirement that a debtor-in-possession file monthly operating statements.

with the following facts: (1) the debtor's reports of cash receipts and disbursements contain no justification for the amounts being transferred by the debtor to its parent corporation; (2) the transfers represent a serious depletion of the debtor's assets; (3) an obvious conflict of interest exists in the management of the two (2) corporations because the officers and principals of the parent corporation are the same individuals as the officers and principals of the debtor.

Once the issue of the propriety of the transfers was raised by creditors, it was incumbent upon the debtor to convince the Court that the transfers were not an at random siphoning of assets but rather could be appropriately accounted for. As the debtor has failed to come forward with an appropriate accounting, we view the appointment of a trustee vital to the protection of creditors' interests.

 Failure of a debtor-in-possession to keep adequate books and records is grounds for appointment of a trustee under § 1104(a)(2). *In re Philadelphia Athletic Club, Inc.*, 15 B.R. 60 (Bkrtcy.E.D.Pa. 1981); *In re Hotel Associates, Inc.*, 3 B.R. 343 (Bkrtcy.E.D.Pa.1980). In the case at bench, the books and records of the debtors are clearly inadequate with respect to the basis for the transfers.

In the case of *In re Main Line Motors, Inc.*, 9 B.R. 782 (Bkrtcy.E.D.Pa.1981), this Court was faced with similar facts. The president and sole shareholder of the debtor withdrew substantial sums of cash from its operations and placed them in the control of two (2) Florida corporations which he also owned and controlled. Although there was no relationship between the debtor and the two (2) corporations in that case other than the fact that they shared the same president and owner, and the two (2) Florida corporations were not in bankruptcy, this Court's reasons for appointing a trustee in *Main Line* apply equally as well in this case:

In *Main Line*, we held that:
"the debtor corporation, under the direction of its president and sole share-holder, has evidenced a sufficient degree of incompetence and gross mismanagement within the meaning of § 1104(a)(1) to justify the appointment of a trustee. The transmittal of more than $300,000 out of the debtor corporation, without interest, security, or a written instrument recording the debt, falls far short of any reasonable standard of business management. This commingling of assets occurred under the auspices of the current management of debtor .... and nothing in Mr. Rugiere's testimony convinces us that the transfer of funds was a competent decision or that the debtor's financial accounting practices have improved or will improve under his direction.

We conclude that it is essential at this time to install an independent trustee in this case, and that the appointment is in the interests of both the debtor corporation and its creditors."

9 B.R. at 783–784.

Although a trustee was appointed in *Main Line* under § 1104(a)(1) and (2), there is no reason why the Creditors' Committee in this case could not have moved for the appointment of a trustee under § 1104(a)(1) as well.

Having examined the evidence before us, we believe the appointment of a trustee is in the best interests of creditors. As a disinterested party, the trustee can monitor the relationship between the debtor and its parent corporation, establish controls over the transfer of cash assets, and insure that the assets of the estate are not being depleted. To allow current management to remain in control of the debtor's operations could otherwise work a serious harm to creditors.